1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TIMOTHY ROSS MILLER,

                Plaintiff,

      v.

THURSTON COUNTY; NICOLAS

ANDERSEN; JOEL NAULT,

              Defendant.

Case No. 3:23-cv-05745-TMC

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

On September 17, 2020, Plaintiff Timothy Miller called the Thurston County Sheriff's Office, requesting assistance after an argument between Mr. Miller and his wife Molly Miller turned violent. Thurston County Deputies Nicolas Andersen and Joel Nault arrived on the scene. The Officers questioned Mr. Miller outside. Mr. Miller conceded that he and his wife had thrown things at each other, and, when she tried to end the fight with a hug, he had pushed her. Upon entering the home, the Officers saw that a baby gate had been ripped off its hinges, a computer monitor was cracked open, pieces of a broken TV stand were strewn about, a coffee table had been flipped over, and holes were punched in the walls. Ms. Miller confirmed that Mr. Miller was responsible. She also corroborated Mr. Miller's admission that he had pushed her.

The Officers arrested Mr. Miller and charged him with assault in the fourth degree (domestic violence) and malicious mischief in the third degree (domestic violence). They also issued a No Contact Domestic Violence Order, which Mr. Miller violated twice. Mr. Miller ultimately pleaded guilty to violating the No Contact Order. In exchange, the Thurston County Prosecuting Attorney's Office dropped the charges against Mr. Miller for assault and malicious mischief. Shortly thereafter, Mr. Miller filed this case. He alleges that the Officers and Thurston County violated his First, Second, Fourth, and Fourteenth Amendment rights. He claims false arrest, unlawful detainment, falsification of a police report, malicious prosecution, and removal of firearm rights.

The Constitution protects individuals from unreasonable search and seizure. Undergoing arrest and detention when a person has done nothing unlawful causes the arrestee real harm. For this reason, to arrest someone without a warrant, officers must have probable cause. When officers have probable cause, their decision to make an arrest does not violate the Constitution. Here, officers had probable cause to arrest Mr. Miller. He conceded that his argument with Ms. Miller turned physical; officers entered the home to find broken items everywhere and holes punched in the wall; and Ms. Miller confirmed that Mr. Miller had thrown items at her and pushed her. Together, these facts created probable cause for arrest and prosecution. Mr. Miller has provided no evidence that this information—or any information contained in the police report—was falsified. Accordingly, the Court GRANTS Defendants Thurston County, Nicolas Andersen, and Joel Nault's motion for summary judgment (Dkt. 38).

## II.    BACKGROUND

On September 17, 2020, Mr. Miller called the Thurston County Sheriff's Office, alleging a domestic violence incident. Dkt. 39-1 at 6. Thurston County Deputy Nic Andersen responded to the call and Deputy Joel Nault arrived to assist soon after. *Id.*; Dkt. 38 at 2. Mr. Miller

answered the door. Dkt. 39-1 at 6. He stepped outside and spoke to the Officers. *Id.* Mr. Miller told Deputy Andersen that the Millers were in the process of divorcing. *Id.* They had been discussing the details of their separation when they began fighting. *Id.* Mr. Miller explained that he threw food at Ms. Miller and she had responded by throwing a plastic jug of water at him. *Id.* He conceded that he had thrown other "stuff." *Id.* Mr. Miller also told Deputy Andersen that Ms. Miller had tried to hug him, and he had pushed her away, injuring her arm. *Id.*

Deputy Andersen left Mr. Miller with another officer (Deputy Moore) and went into the residence. *Id.* Inside, Deputy Andersen observed "broken items strewn all over the floor," including a broken TV stand and a cracked computer monitor. *Id.* at 6–7. The coffee table had been flipped over. *Id.* at 6. There were "several holes punched in the bedroom walls, [and a] black baby gate ripped off its hinges." *Id.* at 7. Deputy Andersen found Ms. Miller "sobbing[,]" "curled up with her knees to her chest and back against the wall." *Id.* Ms. Miller confirmed that Mr. Miller had thrown several items at her, including the TV and TV stand. *Id.* She told Deputy Andersen that Mr. Miller had flipped the coffee table over and ripped the baby gate off its hinges. *Id.* Ms. Miller also confirmed that Mr. Miller had pushed her. *Id.* She told Deputy Andersen that she had been "begging him to stop fighting and trying to apologize while attempting to hug him" when he "grabbed [her] by the arm and pushed her." *Id.*

After gathering this information, Deputy Andersen and Deputy Nault "determined . . . there was probable cause for Assault 4th degree Domestic Violence (DV) and Malicious Mischief 3rd Degree DV." *Id.* The officers left the residence and placed Mr. Miller, still waiting outside, under arrest. *Id.*

After transporting Mr. Miller to the Thurston County jail, Deputy Andersen returned to the home. *Id.* He obtained a witness statement from Ms. Miller. *Id.* Ms. Miller, still fearful, asked Deputy Andersen, "You told him I didn't want him arrested right?" *Id.* Ms. Miller expressed fear

that Mr. Miller would "kill her if he thought she wanted him arrested." *Id.* Ms. Miller described

several other incidences in which Mr. Miller had threatened her with physical violence. *Id.* at 8.

Deputy Andersen documented the scene, taking pictures of the broken items. *Id.*  He confirmed

that Mr. Miller had thrown the items at Ms. Miller. *Id.* He found a broken CD case on the floor

and asked Ms. Miller if Mr. Miller had thrown it at her. *Id.* at 8. She confirmed that he had, and,

had she not ducked in time, it would have hit her. *Id.* Deputy Andersen concluded that there was

further "probable cause for Assault 4th degree DV due to this evidence." *Id.* Before leaving, he

advised Ms. Miller to seek a protection order. *Id.*

On September 21, 2020, Thurston County Deputy Prosecutor Alexis Egolf filed a

criminal complaint charging Mr. Miller with Assault 4th Degree/Domestic Violence and

Malicious Mischief 3rd Degree/Domestic Violence. Dkt. 39-2 at 2. Alongside the complaint, the

Thurston County Prosecutor submitted a Domestic Violence No Contact Order. *See* Dkt. 39-3 at

2; Dkt. 38 at 3. The Order prohibited Mr. Miller from contacting Ms. Miller or coming within

1,000 feet of her "residence, school, workplace and person." Dkt. 39-3 at 2. Mr. Miller violated

the Order on two separate occasions. Dkt. 39-4 at 2. Mr. Miller was then charged with two

counts of Violation of a Domestic Violence Protection Order. *Id.*

Mr. Miller pleaded guilty to two counts of Violation of a Domestic Violence Protection

Order. *Id.* In exchange, the Prosecuting Attorney's Office agreed to dismiss the Assault and

Malicious Mischief charges. Dkt. 38 at 3–4. As part of his guilty plea, Mr. Miller agreed both to

undergo a domestic violence treatment course and to give up his right to possess firearms. *Id.*;

*see also* Dkt. 39-4 at 3–4.

On August 18, 2023, Mr. Miller filed this lawsuit against Thurston County, also naming

Deputies Andersen and Nault as Defendants. Dkt. 3 at 1–2. Mr. Miller claims violations of his

First, Second, Fourth, and Fourteenth Amendment Rights. *Id.* at 3. On August 22, 2024,

1    Defendants moved for summary judgment on all claims. Dkt. 38. Plaintiff responded on

2    September 15, 2024. Dkt. 47. The motion is ripe for this Court's review.

3                                    **III.    DISCUSSION**

4    **A.    Legal Standard**

5            "The court shall grant summary judgment if the movant shows that there is no genuine

6    dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

7    Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving

8    party fails to make a sufficient showing on an essential element of a claim in the case on which

9    the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

10   A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could

11   return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054,

12   1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

13           The evidence relied upon by the nonmoving party must be able to be "presented in a form

14   that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration

15   used to support or oppose a motion must be made on personal knowledge, set out facts that

16   would be admissible in evidence, and show that the affiant or declarant is competent to testify on

17   the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 ("A witness may testify

18   to a matter only if evidence is introduced sufficient to support a finding that the witness has

19   personal knowledge of the matter. Evidence to prove personal knowledge may consist of the

20   witness's own testimony."). Conclusory, nonspecific statements in affidavits are not sufficient,

21   and "missing facts" will not be "presume[d]." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889

22   (1990). However, "[t]he evidence of the nonmovant is to be believed, and all justifiable

23   inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)

24   (quoting *Anderson*, 477 U.S. at 255). Consequently, "a District Court must resolve any factual

1

2

3

issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan,* 497 U.S. at 888 (internal quotations omitted).

4

**B.    Officers had probable cause to arrest Mr. Miller.**

5

6

7

8

9

10

11

Mr. Miller claims that Defendant Officers violated his Fourth and Fourteenth Amendment rights when they wrongfully arrested and detained him for approximately twenty hours. Dkt. 3 at 5. Mr. Miller also claims that Defendants falsified information in their reports, leading to unsupported criminal charges against him that violated his Fourth Amendment rights. *Id.* at 5–6. Defendants argue that they are entitled to summary judgment because the Officers have provided unrefuted evidence that they had probable cause to arrest Mr. Miller and support the charges against him. Dkt. 38 at 7–12.

12

13

14

15

16

17

18

"Arrest by police officers without probable cause violates the Fourth Amendment's guarantee of security from unreasonable searches and seizures, giving rise to a claim for false arrest under § 1983." *Caballero v. City of Concord*, 956 F.2d 204, 206 (9th Cir. 1992). "To prevail on [a] § 1983 claim for false arrest" and imprisonment, the plaintiff must "demonstrate that there was no probable cause to arrest him." *Norse v. City of Santa Cruz*, 629 F.3d 966, 978 (9th Cir. 2010) (en banc) (quoting *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) (per curiam)).

19

20

21

22

23

24

Probable cause exists where "the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the plaintiff had committed or was committing an offense." *Hart v. Parks*, 450 F.3d 1059, 1065–66 (9th Cir. 2006) (quoting *Bailey v. Newland*, 263 F.3d 1022, 1031 (9th Cir. 2001)) (internal alterations omitted); *see also Grant v. City of Long Beach*, 315 F.3d 1081, 1085 (9th Cir. 2002) ("Probable cause exists when under the totality of circumstances known to

1    the arresting officers, a prudent person would have concluded that there was a fair probability

2    that the defendant had committed a crime." (cleaned up)).

3        Defendant Officers had probable cause to arrest Mr. Miller for violating RCW

4    9A.36.041, assault in the fourth degree. Under Washington law, a "person is guilty of assault in

5    the fourth degree if . . . he or she assaults another." RCW 9A.36.041(1). Washington law does

6    not define "assault" in statute. *State v. Stevens*, 158 Wn. 2d 304, 310–11, 143 P.3d 817 (2006).

7    Rather, Washington courts apply the common law definitions. *Id.* Washington courts recognize

8    three definitions of assault: "(1) an attempt, with unlawful force, to inflict bodily injury upon

9    another; (2) an unlawful touching with criminal intent; and (3) putting another in apprehension of

10   harm whether or not the actor intends to inflict or is incapable of inflicting that harm." *Id.*

11       Here, Defendant Officers had probable cause to believe that Mr. Miller had assaulted

12   Ms. Miller. First, Mr. Miller himself conceded to having thrown "stuff" at Ms. Miller. Dkt. 39-1

13   at 6. Second, Mr. Miller conceded to having pushed Ms. Miller. *Id.* And Ms. Miller corroborated

14   both statements. *Id.* at 7. She confirmed that Mr. Miller was responsible for the destruction of

15   various items in the home. *Id.* This evidence is enough that "a prudent person would have

16   concluded that there was a fair probability" that Mr. Miller had committed the crime of assault in

17   the fourth degree. *See Grant*, 315 F.3d at 1085. A reasonable officer could conclude that Mr.

18   Miller intended to create apprehension of harm in Ms. Miller or to inflict injury upon her. Thus,

19   Defendant Officers' decision to arrest and initiate charges for assault against Mr. Miller did not

20   violate the Fourth Amendment.

21       Officers also had probable cause to arrest Mr. Miller for violating RCW 9A.48.090,

22   malicious mischief in the third degree. Under Washington law, a person is guilty of malicious

23   mischief in the third degree if they "[k]nowingly and maliciously cause[] physical damage to the

24   property of another, under circumstances not amounting to malicious mischief in the first or

second degree[.]" RCW 9A.48.090(1)(a). When Defendant Officers entered the Millers' home, they saw various broken items strewn about. Dkt. 39-1 at 6–7. Ms. Miller confirmed that Mr. Miller was responsible for throwing and breaking the items. *Id.*

This evidence establishes probable cause to believe Mr. Miller had committed the crime of malicious mischief. The Officers' decision to arrest Mr. Miller, leading to the charges against him, did not violate the Fourth Amendment.

Both offenses were also charged as domestic violence crimes. Under Washington state law, selected crimes are domestic violence when "committed either by (a) one family or household member against another family or household member, or (b) one intimate partner against another intimate partner[.]" RCW 10.99.020. That list of crimes includes assault in the fourth degree and malicious mischief in the third degree. RCW 10.99.020(iv), (xiv). "Intimate partner" is defined to include spouses. RCW 10.99.020(8)(a).

At the time of the incident, the Millers were legally married. *See* Dkt. 39-1 at 6. Both Mr. and Mrs. Miller conceded that they were arguing. *Id.* at 6–7. Mr. Miller admitted to pushing Mrs. Miller and throwing items at her. *Id.* at 6. Mrs. Miller affirmed these statements. *Id.* at 7. And she added that Mr. Miller had damaged multiple items in the house, including ripping the baby gate off its hinges, flipping the coffee table, breaking the computer monitor screen, and punching holes in the walls. *Id.*

Defendant Officers thus had probable cause to arrest Mr. Miller and treat the suspected crimes as domestic violence. Mr. Miller has provided no admissible evidence to raise a question of fact as to the truth of any of element of the Officers' report. *See generally* Dkt. 47. He does not refute any of the statements made in the report. *See generally id*. Rather, he argues that these are all "false accusations" and quarrels with verbiage and language used in both the police report and a later written Field Training Program report. *See, e.g.*, Dkt. 47 at 3–7. He claims that "[t]he

female on the scene was immediately the victim and Deputy Nault had likely determined that prior to his arrival to the residence. If a different deputy had arrived at the scene, there is extreme unlikeliness that this would have occurred in the manner it did." *Id.* at 7. Mr. Miller does not provide any evidence to support this statement. If anything, the statement is contradicted by the Field Training Program report, which admonishes Deputy Andersen for not recognizing signs of domestic violence more quickly. Dkt. 47 at 20.

Further, as discussed below, the discrepancies between the police report and Field Training Program report are minimal and a natural product of the differences between the documents; one is a police report, the other is an internal review of Deputy Andersen's actions on the scene. *See infra* Sec. III.D.

Mr. Miller has not pointed to any evidence that would show Defendant Officers lacked probable cause to arrest him, nor that their decisions were the result of any bias. For these reasons, Mr. Miller's Fourth and Fourteenth Amendment claims must be dismissed.

**C.    Mr. Miller has failed to provide evidence that his Second Amendment rights were violated.**

Mr. Miller alleges that Defendants violated his Second Amendment rights by barring him from owning a firearm. Dkt. 3 at 3, 6. Mr. Miller was first charged with assault and malicious mischief. Dkt. 39-2 at 2. A Domestic Violence No Contact Order was then also issued. Dkt. 39-3 at 2–3. He later violated the No Contact Order twice. Dkt. 39-4 at 2. Mr. Miller ultimately pleaded guilty to violating the No Contact Order, and in turn, the remaining charges against him were dropped. *Id.* at 2–3. When Mr. Miller pleaded guilty to violating the No Contact Order, he lost his right to possess a firearm. *Id.* at 4.

First, as a threshold matter, for an officer to be liable under Section 1983 "there must be a showing of personal participation in the alleged rights deprivation." *Jones v. Williams*, 297 F.3d

930, 934 (9th Cir. 2002); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (requiring personal participation in the alleged constitutional violations). Mr. Miller has not offered any evidence that the Defendants participated in the events that led to him being charged with and convicted of violating the No Contact Order. It was that conviction—not the initial arrest by the Defendants here—that led to Mr. Miller's indefinite loss of his right to possess a firearm. Because the officers did not personally participate in causing this loss, they cannot be held liable under Section 1983.

Second, even had the Officers personally participated in the process, Mr. Miller has not been deprived of his rights. Though the Second Amendment protects an individual's right to bear arms, an individual may lose their right to possess a gun if convicted of a crime. *United States v. Castleman*, 572 U.S. 157, 159 (2014). In *Castleman*, the Supreme Court upheld a federal law prohibiting individuals convicted of a misdemeanor crime of domestic violence from ever possessing a firearm. *Id.* ("Recognizing that firearms and domestic strife are a potentially deadly combination, . . . Congress has forbade the possession of firearms by anyone convicted of a misdemeanor crime of domestic violence.") (cleaned up). The Ninth Circuit later upheld a California law that prohibited the possession of a firearm following a misdemeanor domestic conviction even after the individual's conviction was vacated. *Fortson v. Los Angeles City Attorney's Off.*, 852 F.3d 1190, 1194 (9th Cir. 2017). These kinds of restrictions comport with the history, practice, and purpose of the Second Amendment. *See United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013). As the Ninth Circuit has explained, the "core of the Second Amendment is 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Id.* (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). A citizen who breaks the law may lose this right. *See id.*

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 10

Under RCW 10.99.020(4)(xviii), violating a No Contact Order is a domestic violence crime. Mr. Miller pleaded guilty to violating the No Contact Order. Mr. Miller's loss of his right to possess a firearm when he entered his guilty plea did not violate the Second Amendment.

**D.     Mr. Miller has also failed to provide evidence that his First Amendment rights were violated.**

Mr. Miller also claims that his First Amendment rights were violated when "OFC Andersen falsified a police report to support his decision to falsely arrest the plaintiff, using his own desired verbiage in place to incriminate the plaintiff." Dkt. 3 at 5. The First Amendment restricts the government from infringing on individuals' freedom of speech, religion, press, assembly, and petition. U.S. Const. amend. I. The First Amendment does not, however, protect against the possible falsification of a police report. If a police officer writes a false report, it may violate an individual's constitutional rights. *See, e.g.*, *Hall v. City of Los Angeles*, 697 F.3d 1059, 1066 (9th Cir. 2012) ("[D]efendants enjoy a constitutional right to be free from prosecution based on deliberately fabricated evidence."). But a falsified report would violate the Fourteenth Amendment's Due Process Clause or the Fourth Amendment's protection against unreasonable seizures, not the First Amendment. *See id.* at 1068 (fabrication of evidence could constitute a Fourteenth Amendment violation); *see also Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002) (falsification of report which led to petitioner's incarceration adequately alleged a Fourth Amendment violation).

And Mr. Miller has provided no evidence that the report was falsified. In his response to Defendants' motion for summary judgment, Mr. Miller points to a Field Training Program narrative as evidence that the police report was falsified. Dkt. 47 at 2. Mr. Miller is correct that the narrative shows that Deputy Andersen was in training, and Mr. Miller rightly points out that

this information is missing from the police report. *Id.* Mr. Miller also points out several differences in the narrative and the report. *Id.* at 2–3.

Yet these discrepancies are not material conflicts between the two documents, nor are they evidence that the police report was falsified. Rather, they stem from differences between the kinds of documents. The police report is an official document, explaining in depth what occurred at the scene. *See generally* Dkt. 39-1. The Field Training Program narrative is an internal tool used to evaluate a deputy's techniques. Dkt. 47 at 20; Dkt. 48 at 2. The Field Training Program narrative also does not conflict with the police report. *See* Dkt. 47 at 20. Rather the narrative indicates that there was strong evidence of domestic violence—so much evidence that Deputy Andersen was admonished for not arriving at the conclusion that there was probable cause for a domestic violence arrest sooner. *Id.*

Thus, Mr. Miller has provided no evidence that the police report was falsified. His First Amendment claim fails as a matter of law. Any related Fourth or Fourteenth Amendment claims similarly fail.

**E.    Because there was probable cause, Thurston County is absolved of municipal liability.**

Defendant Officers also claim qualified immunity from suit, and Thurston County argues that Mr. Miller has presented no evidence to support municipal liability under Section 1983. Dkt. 38 at 13–16. As to the individual officers, because probable cause existed and no constitutional violation occurred, the Court need not address the Officers' qualified immunity arguments.

As to the liability of Thurston County, municipal liability depends on the grounds laid out in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694–95 (1978). Under *Monell*, a municipality can be held liable under 42 U.S.C. § 1983 for constitutional

violations when the violation was caused by a policy or custom of the municipality. *Id.* But "an individual may recover under § 1983 only when his federal rights have been violated." *Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir. 1996). If there is no underlying constitutional violation, there can be no municipal liability. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.").

Again, as discussed above, Mr. Miller has failed to provide evidence of any constitutional violation. Because Mr. Miller has failed to show an underlying constitutional violation, there is no basis for liability for Defendant Thurston County under *Monell*.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment. The case is dismissed with prejudice.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 14th day of November, 2024.

_____
Tiffany M. Cartwright
United States District Judge